William J. PENN, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–14270.

Court of Criminal Appeals of Oklahoma.

April 2, 1969.

Rehearing Denied June 25, 1969.

Thomas A. Wallace, Sapulpa, for plaintiff in error.

G. T. Blankenship, Atty. Gen., Hugh H. Collum, Asst. Atty. Gen., for defendant in error.

BRETT, Presiding Judge.

Plaintiff in Error, William J. Penn, hereinafter referred to as defendant was charged by Information in the District Court of Creek County, Oklahoma, with the crime of murder.

The matter came on for jury trial before the judge of said District Court on October 5, 1966. On October 6, 1966, the jury returned a verdict finding the defendant guilty of the included offense of Manslaughter of the First Degree and fixing his punishment at thirty (30) years imprisonment. On October 10, 1966, defendant filed his Motion For New Trial which was overruled the following day. Thereupon, Judgment and Sentence was entered upon the jury's verdict on October 11, 1966.

From said Judgment and Sentence defendant has perfected his appeal to this court on April 10, 1967.

Defendant urges in his brief one single proposition, based upon the United States Supreme Court decision in Miranda v. Ari-

zona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694. His proposition recites as follows:

"The prosecution is prohibited by the Federal Constitution from using a statement taken from a defendant while in police custody where it fails to demonstrate the use of procedural safeguards effective to secure the privilege against self-incrimination."

Defendant was charged, with two other negro men, with the death of one, Perry Early Jett, on June 24, 1966 while they were engaged in the felonious act of committing robbery in the first degree. The testimony revealed that the deceased and another man, Tracy Kelly, had been on a drinking bout on June 24th at an abandoned warehouse in Sapulpa, Oklahoma and the deceased "passed out." The State's witness, Tracy Kelly, testified that three young negro men came to where he and the deceased, Perry Jett, were and they grabbed the deceased and took his billfold; he stated that when he saw what was happening, he started crawling out from under the warehouse dock, when he was struck with a wine bottle; and, that his eye glasses and wallet were taken from him. However, this witness testified that he did not observe any of the men strike or hit the deceased.

The Pathologist, Dr. Leo Lowbeer, testified that the deceased died from a rupture of the heart caused by trauma exerted upon the chest, which also broke deceased's breast bone and caused the bruise in the skin over the heart area.

Officer Logan Gantz, a patrolman for City of Sapulpa, testified substantially that he investigated the scene of the alleged murder on the evening in question, and found decedent's body. He further testified that he found hiding under the depot one, Tracy Kelly, who was bloody and cut, and that Kelly's pants were torn on both sides down to his ankles. The officer arrested Kelly for drunkenness.

Detective Lieutenant Bill Jordan of the Sapulpa City Police testified: that he conducted an investigation of the alleged murder, and during the course of the investigation asked the defendant for an interview. Later that evening, July 5, 1966, defendant came to the Lieutenant's house, and they proceeded to the courthouse for the interview. At the courthouse, the defendant was arrested as a suspect. The record reveals the testimony as follows:

"Q. Did you advise him at that time of any rights he had in regard to giving a statement or obtaining an attorney of any kind?

"A. I did.

"Q. What did you say to him?

"A. I told him I would like to get a statement from him, but before I did or asked him any questions I wanted to advise him that he had the right to silence, that he did not have to answer any questions, and that if he did, they might possibly in the future be used in court against him, and I also advised him that he had the right to legal counsel, an attorney, and I also advised him that if he didn't have the money to pay for an attorney that the County would appoint him an attorney right there and that they would pay for it.

"Q. Did he give you a statement, Mr. Jordan?

"A. No, he did not.

"Q. He declined to give a statement?

"A. He declined after that time."

The record reflects also that at this point the defendant telephoned his mother. On the following day, July 6, 1966, the defendant [a nineteen year old negro] was joined by his mother in the County Attorney's office. Also present, besides the defendant and his mother were: three policemen, the County Attorney and his assistant, and a district court reporter. Admittedly the purpose of the meeting was to obtain a statement from the defendant, if he chose to make one.

The record before the Court reflects the following to have transpired immediately preceding the taking of defendant's statement. Mr. Ben Baker, assistant county at-

torney recited, as follows: [State's exhibit number 6, page 594 of the casemade.]

"MR. BAKER: Mr. Reporter, I would like for the record to show that the following parties are in the County Attorney's office in the Courthouse at Sapulpa, at 12:00 o'clock noon on July 6, 1966.

"Mr. Earl Sellers, Chief of Police, City of Sapulpa; Detective Sergeant Bill Jordan of the Sapulpa Police Department; Deputy Sheriff, Fred Booker, of the Creek County Sheriff's office; Mr. James Swartz, County Attorney; Penn, who is here with his mother, Mrs. Penn, plus James Garrett, CSR, official District Court Reporter.

"Now, William, first I want to say to you that you are here for the purpose of giving a statement to me and these other gentlemen. Before you say anything I wish to advise you that under the law you don't have to give a statement, you don't have to answer any questions or say anything, but if you do agree to give a statement, anything you say can be taken down and used in evidence against you in a court of law. I want to advise you that you are entitled to have an attorney present at all stages of this proceeding, if you give a statement or if you don't; if you can't afford to employ an attorney, the law provides that the State of Oklahoma will provide an attorney for you.

"*Do you understand these four rights you have that I have just explained to you?*

"A. (William Penn) *Yes, sir.*

"Q. (Mr. Baker) *You do understand, William?*

"A. *Yes.*

"Q. It will be necessary for you to speak up loudly so that Mr. Garrett can understand what you say. Would you like this air conditioner off?

"A. That's all right.

"Q. *Mrs. Penn, have you understood what I have just said to William?*

"A. (Mrs. Penn) *Yes, sir.*

"(Fred Brooker:) Do you want him to go ahead with the statement?"

"(Mrs. Penn) *I want him to give a statement, I want my son to give a statement.* I can't talk plain.

"Q. (Mr. Baker) William, I will ask you one more thing, do you have any questions about the rights that you have now, about making or giving the statement?

"A. (William Penn) About this attorney, how do I go about getting one?

"Q. Well, you can employ an attorney you want to employ to represent you, if you haven't the funds with which to employ an attorney, the law now provides an attorney can be appointed to represent you.

"A. If I don't have an attorney, how do I go about it?

"Q. Well, if you don't have an attorney, the law will appoint one for you at the proper time, and *will appoint one for you before you give a statement. With that understanding* do you still wish to give a statement?

"A. Yes.

"Q. Did you say 'yes'?

"A. Yes." (Emphasis added.)

Thereafter defendant's statement was taken and was subsequently introduced into evidence over defendant's objection, to which he properly excepted.

The contention is set forth in defendant's brief that his statement was taken before he was fully apprised of his rights, and that he did not intelligently waive his rights before the statement was taken. Defense counsel also asserts, that the defendant *indicated* that he wanted an attorney when he asked, "If I don't have an attorney, how do I go about getting one?" Counsel contends further that defendant was not given the admonitions set forth as being required in Miranda v. Arizona, supra, but we do not accept this contention. It appears from the record that the assistant county attorney gave the proper admonitions to the defendant in about as clear

and simple language as they can be given. It clearly appears also, that defendant knew and understood what was transpiring, and what he was doing and saying.

■ As we review the requirements of the Miranda opinion, the admonitions are, as follows:

"* * * He [defendant] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. * * *"

There is nothing in the record to show that the defendant refused to answer any questions during the time the statement was being taken, nor did he make any request whatsoever, for an attorney to be present. It appears from the record also, that defendant's motivation for giving the statement resulted from the admonition defendant's mother gave him when she stated that *she wanted him to give a statement*, and not because of any undue influence exerted by the other persons present, when the statement was taken. By the same token, the defendant expressed in a positive manner, his understanding of his rights as well as that concerning his right to have an attorney present, even before the statement was commenced. Certainly, it would have been more conclusive had the county attorney obtained a written waiver of defendant's constitutional rights; but at the time this statement was taken, the full impact of Miranda v. Arizona, supra, was not clearly understood by many persons. Nonetheless, the record before the Court clearly shows that the State did demonstrate the use of proper procedural safeguards effective to secure the privilege against self-incrimination.

Counsel for defendant reiterates throughout defendant's brief that defendant did not intelligently waive his right to counsel, and raises the question whether if defendant had fully understood his rights, he would have waived them. The record shows that the day before he gave his statement that, having been apprised of his rights, he exercised them and refused to make a statement. *At his mother's insistence he waived his rights the next day after he was again properly advised.*

Counsel for defendant also implies in his brief that the defendant was not sufficiently intelligent to understand his rights and to waive them. But the record reveals that the defendant lacked only several months of completing high school, and it reflects that the defendant was sufficiently articulate to make his answers clear and intelligible, when he gave his statement.

Since the defendant did not testify at his trial, and offered no other evidence, we draw these conclusions from the answers given when the statement was recorded by the court reporter. The record also reflects that defendant was ably represented by counsel throughout the proceedings and on this appeal.

■ Therefore, after having considered the record of trial and the briefs filed herein, we are of the opinion that defendant knowingly and intelligently waived his right to counsel at the time his statement was taken; that he was provided proper procedural safeguards; that he received a fair trial according to due process of law; and that the trial court did not commit error when defendant's statement was admitted into evidence. Our examination of the record also shows that there was sufficient evidence, both direct and circumstantial, to sustain defendant's conviction for first degree manslaughter. The trial court properly instructed the jury concerning the law applicable to the facts of the case, and the sentence is within the maximum provided by law.

We therefore conclude that this case should be, and the same is, affirmed.

Judgment and sentence affirmed.

BUSSEY and NIX, JJ., concur.